OPINION
{¶ 1} Plaintiff-appellant, Jennifer A. Kost, appeals the judgment of the Lake County Court of Common Pleas, Juvenile Division, adopting the shared parenting plan submitted by defendant-appellee, Jeffrey Gembus, and awarding Kost child support in the amount of $125.00 per month. We affirm as to the shared parenting plan and reverse and remand as to the child support order.
 {¶ 2} The child, Isabella Gembus was born to Kost on December 27, 2001. Gembus was determined to be the father. The parties met on December 31, 2000 at a *Page 2 
New Years Eve party. At the time they met, appellant was legally separated but still living with her then-husband, Frank Kost, from whom she was divorced in early 2002. Appellant and Kost have a child together, Mikaela. Mikaela is six years older than Bella.
 {¶ 3} Appellant moved out of Kost's home with Mikaela in April 2001, to a home in Willoughby, Ohio, but found that it was difficult to meet the rent and living expenses. In May 2001, around the time appellant discovered that she was pregnant with Isabella, appellee agreed to move into appellant's house in Willoughby. Appellee works as a full-time firefighter and paramedic for the City of Broadview Heights, where he works a 24 hour shift, followed by 48 hours off. He also works as a registered nurse at Marymount Hospital, where he determines his own schedule. From the time the couple started living together until the end of the summer of 2001, appellee also worked as a nurse for Six Flags Amusement Park.
 {¶ 4} Appellant, who had worked full time for Employon until Isabella was born, eventually moved to a part-time schedule, before deciding to quit her job and stay at home with the children. Appellant also attended classes at Lakeland Community College part time, while appellee provided financial support. Appellant also received child support income for Mikaela from Kost. In May or June of 2002, the couple moved to a house in Euclid, Ohio, which appellee purchased in his own name.
 {¶ 5} From the beginning, the relationship between the couple could best be described as tempestuous. Both testified that they did not see each other much, due to appellee working a lot, but that there were frequent arguments between them on various issues. Both parties agree that they had, and continue to have, difficulties communicating with each other. When appellee was present during the ultrasound examination during appellant's pregnancy with Isabella, he learned that she had *Page 3 
previously had an abortion and the relationship deteriorated steadily after that. There were disagreements about finances, resulting in appellant going back to work part time as a bartender, a job of which appellee disapproved. Appellant made allegations of three separate incidents in which appellee grabbed her. Appellee alleged that after one particular argument, appellant locked him out of the house and "trashed" the dining room, breaking a ceiling fixture. Appellee told appellant that she was "unfit." Appellee testified as to animosity between appellant's father and himself, both before and after the relationship ended. Eventually, the couple agreed to separate in April 2003, with appellant and the children going to live with her grandmother.
 {¶ 6} On May 12, 2003, appellant filed the instant complaint in the Lake County Juvenile Court, seeking to establish herself as custodial/residential parent and for child support. Appellant filed an answer and counterclaim, followed by an emergency motion to establish an allocation of parenting time in June of 2003.
 {¶ 7} During the pendency of the matter, the parties had an informal verbal agreement with respect to custody, in which each spent an approximately equal amount of time with Isabella. Because of their continuing difficulties with communication, this agreement slowly began to unravel. After one rather contentious disagreement surrounding visitation around the holidays and Isabella's birthday, appellant denied appellee visitation for a period of fourteen days.
 {¶ 8} Following this incident, appellee filed a second motion to establish a temporary order for a schedule of parenting time and a motion for shared parenting with an attached shared parenting plan.
 {¶ 9} Following a hearing on January 30, 2004, the parties agreed to an interim visitation and support agreement providing for an approximately equal amount of *Page 4 
parenting time, based upon a modified version of defendant's proposed shared parenting plan. This agreement was adopted by the court as a temporary order pending a hearing of the issue. As part of this temporary order, appellee agreed to pay appellant $300 per month in child support "subject to modification and adjustment."[1]
 {¶ 10} The matter proceeded to hearing on April 29, 2004. One day later, the trial court ordered the parties to submit proposed child support calculations within fourteen days.
 {¶ 11} On September 2, 2004, the magistrate issued his first decision, finding that "shared parenting is appropriate based upon the evidence presented and it is in the best interest of the child." However, since appellee was the only party to submit a proposed shared parenting plan, the magistrate concluded that it was also in the best interest of Isabella for appellant to submit her own shared parenting plan within twenty-one days of the decision.
 {¶ 12} The magistrate's decision also left open the option of the parties adopting an agreed upon shared parenting plan if they were able to reach agreement within the twenty-one day period. The magistrate's decision deferred final determination on shared parenting and child support pending the court's adoption of a final shared parenting plan. Appellant filed a motion for leave to file objections to the magistrate's decision pending final resolution of these issues. That motion was granted.
 {¶ 13} Appellant filed her proposed shared parenting plan on September 29, 2004. The plan called for significantly reduced time (approximately 35%), making *Page 5 
Isabella available to appellee pursuant to his work schedule, and requested the sum of $771.42 per month in support.
 {¶ 14} On February 18, 2005, the magistrate issued his decision adopting appellee's proposed shared parenting plan. On March 4, 2005, appellant filed objections to the magistrate's decision, and motioned the court for leave to supplement with a transcript of the April 2004 hearing. The trial court granted this motion.
 {¶ 15} On June 26, 2005, the trial court adopted the magistrate's decisions in full.
 {¶ 16} Appellant timely appealed, assigning the following as error:
 {¶ 17} "[1] THE TRIAL COURT ERRED IN FINDING THAT SHARED PARENTING WAS APPROPRIATE IN THE INSTANT CASE AND FAILED TO PROPERLY APPLY THE STATUTORY FACTORS SET FORTH IN § 3109.04(F)(2)(A)-(E) AND §3109.04(F)(1)(A)-(J).
 {¶ 18} "[2] THE TRIAL COURT ERRED BY FAILING TO CALCULATE CHILD SUPPORT PURSUANT TO STATUE AND BY GRANTING A DEVIATION THAT WAS NOT IN THE BEST INTEREST OF THE CHILD."
 {¶ 19} R.C. 3109.04(A) governs the award of parental rights and responsibilities, and provides, in relevant part, as follows:
 {¶ 20} "* * *[I]n any proceeding pertaining to the allocation of parental rights and responsibilities for the care of a child, upon hearing the testimony of either or both parents * * * the court shall allocate the parental rights and responsibilities for the care of the minor children * * *. Subject to division (D)(2) of this section, the court may allocate *Page 6 
the parental rights and responsibilities for the care of children in either of the following ways:
 {¶ 21} "(1) * * *
 {¶ 22} "(2) If at least one parent files a pleading or motion in accordance with division (G) of this section and a plan for shared parenting pursuant to that division and if a plan for shared parenting is in the best interest of the children and is approved by the court in accordance with division (D)(1) of this section, the court may allocate the parental rights and responsibilities for the care of the children to both parents and issue a shared parenting order requiring the parents to share all or some of the aspects of the physical and legal care of the children in accordance with the approved plan for shared parenting * * *."
 {¶ 23} R.C. 3109.04(D)(1)(a)(iii) states:
 {¶ 24} "* * * [I]f only one parent * * * files a motion and also files a plan, the court in the best interest of the children may order the other parent to file a plan for shared parenting in accordance with division (G) of this section. The court shall review each plan filed to determine if any plan is in the best interest of the children. If the court determines that one of the filed plans is in the best interest of the children, the court may approve the plan * * *."
 {¶ 25} R.C. 3109.04(G) provides, in relevant part, as follows:
 {¶ 26} "Either parent or both parents of any children may file a * * * motion with the court requesting the court to grant both parents shared parental rights and responsibilities * * * in a proceeding held pursuant to division (A) of this section. If a pleading or motion requesting shared parenting is filed, the parent or parents filing * * * the motion shall also file with the court a plan for the exercise of shared parenting by *Page 7 
both parents. * * * [I]f only one parent files a pleading or motion requesting shared parenting and also files a plan, the other parentas ordered by the court shall file with the court a plan for theexercise of shared parenting by both parents * * *. A plan for shared parenting shall include provisions covering all factors that are relevant to the care of children * * *." (Emphasis added).
 {¶ 27} Decisions of a trial court involving the care and custody of children are accorded great deference upon review. Miller v. Miller
(1988), 37 Ohio St.3d 71, 74. Thus, any judgment of the trial court involving the allocation of parental rights and responsibilities will not be disturbed absent a showing of an abuse of that court's discretion. Davis v. Flickinger, 77 Ohio St.3d 415, 418, 1997-Ohio-260. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219 (citations omitted). The highly deferential abuse of discretion standard is particularly appropriate in child custody cases, since the trial judge is in the best position to determine the credibility of the witnesses and there "`may be much that is evident in the parties' demeanor and attitude that does not translate well to the record.'" Wyatt v. Wyatt, 11th Dist. No. 2004-P-0045, 2005-Ohio-2365, at ¶ 13 (citation omitted). In so doing, a reviewing court is not to weigh the evidence, "* * *but must ascertain from the record whether there is some competent evidence to sustain the findings of the trial court."Clyborn v. Clyborn (1994), 93 Ohio App.3d 192, 196.
 {¶ 28} Appellant argues that the trial court incorrectly determined that residential placement for school purposes should be with appellee, minimized Isabella's adjustment in appellant's home, and discounted the child's strong relationship with Mikaela, her half-sister. She also asserts that the court failed to consider appellee's *Page 8 
failure to support the child from May 1, 2003 through April 29, 2004 and discounted appellee's "physical abuse of the Appellant" while they lived together in conducting its best interest analysis. We disagree.
 {¶ 29} "The court is instructed in R.C. 3109.04(F) to consider `all relevant factors' in determining what is in the best interest of the children, providing a nonexclusive list which includes: (1) the wishes of the parents; (2) the wishes of the children; (3) the children's relationship with the parents; (4) the child's adjustment to home and school; (5) the health of all persons involved; (6) the parent more likely to foster the companionship rights of the nonresidential parent; (7) the prompt payment of support; (8) any history of conviction for abuse; and (9) the geographic location of the parents." Manis v.Manis (Aug. 22, 1997), 11th Dist. No. 96-P-0200, 1997 Ohio App. LEXIS 3784, at *13-*14, citing Bechtol v. Bechtol (1990), 49 Ohio St.3d 21,22.
 {¶ 30} Additionally, R.C. 3109.04(F)(2) provides that when determining whether shared parenting is in the best interest of the children, courts shall consider all relevant factors included in 3109.04(F) plus (1) the ability of the parents to cooperate and make joint decisions with respect to the children; (2) the ability of both parents to encourage the sharing of love, affection and contact between the child and the other parent; (3) the history of or potential for child abuse, spousal abuse, other domestic violence or parental kidnapping by either parent; (4) geographical proximity between the parents as relating to the practicality of a shared parenting plan. By its very terms, the trial court need not make findings with regard to every factor, just those relevant to the case. Manis, at *15. Additionally, the statute requires the trial court to consider the factors of R.C. 3119.23 to determine if a deviation from the amount of child support from the basic child support schedule is warranted. R.C. 3109.04(F)(2). *Page 9 
 {¶ 31} In determining that joint custody of Isabella was in the child's best interest, the magistrate made the following findings of fact and conclusions of law as part of his best-interest analysis. With regard to factors not specifically enumerated by the statute, the magistrate made the following relevant findings:
 {¶ 32} "The Shared Parenting Plan submitted by Defendant, Jeffrey Gembus, is in the child's best interest. It is in Isabella's best interest that parenting time be divided equally, as the parties have arranged and done in the past. By dividing the time evenly, Isabella has the benefit of being raised by both her parents and their families; by dividing the time equally, neither parties' baser impulses are rewarded * * *. Mr. Gembus has requested that the schedule used presently be adopted; the present schedule divides the parenting time equally. Ms. Kost has requested that Mr. Gembus be apportioned only thirty six (36) hours a week of parenting time (absent holidays and vacations) * * *."
 {¶ 33} The magistrate further stated:
 {¶ 34} "Plaintiff has argued that Defendant's work schedule, holding both a full-time position with Broadview Heights Fire Department and a part-time position with Marymount Hospital precludes him from caring for Isabella on a full-time weekly basis; Plaintiff's argument is not supported by the evidence. Defendant, as noted above, has requested a continuation of the schedule that is now in use; the testimony at trial demonstrated that Defendant was able to orient his work schedule to maximize time with his daughter."
 {¶ 35} In addition, the magistrate wrote:
 {¶ 36} "Plaintiff's argument assumes that Ms. Kost's schedule is stable and the evidence presented demonstrates that her situation is otherwise. Plaintiff has gone *Page 10 
from job to job * * *. At the time of trial, Plaintiff testified that she was earning four (4) dollars an hour, plus tips, working as a waitress on a part-time basis. Plaintiff further testified that she has been attending Lakeland [Community College] for the last ten (10) years with the goal of obtaining better employment. If the basis for scheduling parenting time is the clear ability to care for the child on a full-time weekly basis, then Plaintiff clearly misses the mark. Plaintiff, according to her testimony, had been juggling her various employments, college classes, and studying with her obligations to her children — ultimately, she does not control when classes are offered or the hours she works. Neither party has the option of caring solely for their child on a full-time weekly basis.
 {¶ 37} "Plaintiffs shared parenting plan would marginalize Defendant; this is not in Isabella's best interest and it is not supported by the evidence."
 {¶ 38} The magistrate made additional findings, stating that:
 {¶ 39} "Plaintiff has made questionable judgments that raise legitimate concerns regarding her decision making. As indicated in the prior decision, Plaintiff unilaterally terminated the informal parenting time schedule the parents had used for several months. While no court order was in place at that time, Ms. Kost's choice to deny Isabella access to her father was not made to benefit the child. Plaintiff chose to use Isabella as a pawn in an on-going argument."
 {¶ 40} With regard to the child's interactions with parents, siblings, and other persons significantly affecting the child's best interest, the magistrate found:
 {¶ 41} "Both parents presented as caring, involved parents; neither parent effectively refuted evidence of the other parents [sic] abilities.
 {¶ 42} "The child has established relationships with both families and has adjusted to both households; both parents appear to have a close, loving relationship *Page 11 
with Isabella. Both parties have relied upon their families (i.e. the child's grandparents and great grandparents) to provide childcare while they are at work or school. Plaintiff has testified that she felt i[t] was important that the child be with her when Defendant was at work during his scheduled parenting time, as opposed to being with paternal grandparents; Plaintiff has not taken any steps to have Defendant care for Isabella when she is not available as opposed to the child being cared for by members of her family."
 {¶ 43} With respect to the mental and physical health of all persons involved in the situation, the magistrate found as follows:
 {¶ 44} "While Isabella has had problems with ear infections, she is physically healthy. Neither parent has any significant physical or mental health problems."
 {¶ 45} The magistrate found that "[n]either party has a criminal history involving the mistreatment of children."
 {¶ 46} The magistrate also found that "[n]o evidence was presented suggesting either party has * * * or is planning to establish a residence outside this state."
 {¶ 47} With regard to the parent more likely to honor and facilitate court-approved parenting time rights, the magistrate found as follows:
 {¶ 48} "Both parties appear to be likely to honor and facilitate visitation rights approved by the court. The parties had an unwritten agreement that divided parenting time equally; the parties were able to modify the schedule when conflicts arose-initially. As time passed, Plaintiff became displeased with the schedule, the modifications the parties have made around the holidays, and other perceived problems. On the advice of prior counsel, Plaintiff unilaterally discarded the prior arrangement and denied Defendant visitation. The denial of parenting time was not in *Page 12 
the child's best interest. At the next scheduled court hearing (less than two weeks after the interruption in visitation), a written interim agreement for visitation was ordered and Defendant was accorded make-up time for the visits that were lost."
 {¶ 49} With regard to the issues of cooperation to make decisions jointly regarding Isabella's best interest, and the ability to encourage love, affection, and contact with the other parent, the magistrate found:
 {¶ 50} "The parties have the ability to cooperate and make decisions jointly, with respect to their child. They have the ability to encourage the sharing of love, affection, and contact between the child and the other parent. The parties have also shown that they have the ability to engage in petty squabbles and to communicate poorly * * * which in no way benefits Isabella.
 {¶ 51} "There is evidence that the parties can engage in a positive fashion * * *. Plaintiff has been able to execute a shared parenting arrangement with her second husband in regards to her older child. The parties attempted to make their relationship work and moved in together to raise their child; ultimately the parties were unable to overcome the handicaps of a brief history, lack of familial support, and an unplanned pregnancy.
 {¶ 52} "Plaintiff became pregnant with Isabella shortly after the parties began dating. Both parties were shocked to learn of the pregnancy. They pulled together and decided to move in together. Plaintiff was still married to a Frank Kost when the foregoing occurred. Plaintiff, according to her testimony, had initiated the divorce/separation process at least one year before she started her relationship with defendant. Strangely, Plaintiff's father testified at trial that he was unaware his daughter considered herself separated from Frank Kost and was dating, before she moved in with *Page 13 
the Defendant; Mr. Trick [Kost's father] testified that his family liked Frank Kost and continues to be close to him; Defendant testified that he was never accepted by Plaintiffs family; Plaintiffs family clearly has seen Defendant as an interloper that destroyed their daughter's marriage with an unplanned, out-of-wedlock pregnancy-which, according to the testimony of both parties, was not the case.
 {¶ 53} "The parties lacked a significant history before Isabella's birth. They did not know each other well, they did not have a history of working together to resolve problems. They lacked family support and understanding * * *."
 {¶ 54} Regarding any history of spousal abuse and domestic violence, the court noted that:
 {¶ 55} "Plaintiff acknowledged that she had locked Defendant out of his home and damaged a light fixture. Defendant testified that he did grab plaintiff on an occasion, but he said that was to prevent the argument from becoming physical; both parties denied striking the other."
 {¶ 56} Appellant's complaint that the magistrate failed to consider appellee's failure to pay support from May 1, 2003, through the time of trial, April 29, 2004, is unavailing. The plain language of 3109.04(F)(1)(g) requires the court to consider "[w]hether either parent has failed to make * * * child support payments * * * that are required of that parent pursuant to a child support order under which that parent is an obligor." (Emphasis added).
 {¶ 57} A review of the record reveals there was no child support order in effect until the parties reached an interim agreement regarding visitation and child support on January 30, 2004. Prior to that time, the parties had an informal arrangement regarding *Page 14 
visitation. The agreement provided that support, in the amount of $300 per month, would be paid "commencing February 1, 2004, through the child support agency."
 {¶ 58} Although it is true that appellee did not make payment on arrearages until the day of trial, he testified that when he handed the check for $300 directly to Kost on February 1, 2004, "she seemed startled." As a result, he reviewed the agreement and consulted a friend who works for a child support enforcement agency. This friend advised appellee to "hold off" until the order was journalized and a wage attachment performed, since "in the State of Ohio it's deemed a gift if it's not written through the Central Collection Agency."
 {¶ 59} Appellee testified that he provided a check for $600 on the date of trial, which, when journalized, would not be deemed a gift, would be used for the benefit of Isabella and would bring the arrearage up to date. Thus, under these circumstances, the magistrate properly discounted this factor.
 {¶ 60} Appellant's complaints that the trial court failed to consider Isabella's relationship with her half-sister, Mikaela, or that the trial court failed to consider any evidence in determining the residential parent for school purposes are likewise without merit.
 {¶ 61} With respect to the residential parent for school purposes, the magistrate found as follows:
 {¶ 62} "Both parents want Isabella to attend Catholic schools and they both want to be designated the residential parent for education purposes. Neither parent put on any evidence regarding the relative merits of the schools the child would attend * * *. Plaintiff testified that she wanted Isabella to go to school with the child's older half-sister. While Isabella may feel more comfortable attending the same school her sister *Page 15 
attended, the evidence demonstrated that when Isabella is of age to attend Kindergarten her older sister will be in sixth grade."
 {¶ 63} Appellant states in her brief to this court that appellee has enrolled the child in a pre-school program without the Appellant's input or consent. Our review of the record reveals that there is no evidence of this allegation. Considering Isabella was three years old at the time the magistrate issued his decision, we cannot say that the magistrate abused his discretion with regard to this issue.
 {¶ 64} In Ohio, it is well-settled that if an award of custody is supported by competent, credible evidence, such award will not be reversed as being against the manifest weight of the evidence by a reviewing court. Bechtol, supra, at the syllabus. Moreover, "[T]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect * * *. The knowledge obtained through contact with and observation of the parties * * * cannot be conveyed to a reviewing court by the printed record." Miller, supra, at 74.
 {¶ 65} Based upon the foregoing colloquy, we cannot conclude that the trial court erred or abused its discretion by adopting appellee's shared parenting plan. There was competent, credible evidence to support all of the applicable factors under R.C. 3109.04(F). Appellant's first assignment of error is without merit.
 {¶ 66} In her second assignment of error, appellant challenges the magistrate's child support order as a result of the deviations granted to appellee by the trial court. Matters involving child support are reviewed on appeal under an abuse of discretion standard. Rock v.Cabral, (1993), 67 Ohio St.3d 108, 112, citing Booth v. Booth (1989),44 Ohio St.3d 142, 144; Pauly v. Pauly (1997), 80 Ohio St.3d 386, 390. *Page 16 
 {¶ 67} In determining the amount of child support for a shared parenting order, the trial court is obligated to determine each parent's income by using the child support computation worksheet set forth in R.C. 3119.022. See R.C. 3119.01(C)(15); Morjock v. Morjock, 7th Dist. No. 03-MA-146, 2005-Ohio-1768, at ¶ 28. Moreover, R.C. 3119.03 provides that "the amount of child support * * * as calculated pursuant to the basic child support schedule and applicable worksheet through the line establishing the actual annual obligation, is rebuttably presumed to be the correct amount of child support due."
 {¶ 68} The child support worksheet attached to the magistrate's order reflects that appellee earns $77,762 per year. Appellant was imputed with a full-time minimum wage job reflecting an earning capacity of $10,712 per year. Their adjusted gross incomes were $76,206.76 and $7,997.76 respectively following the worksheet exemptions for local taxes, other children and other adjustments. The basic combined child support obligation therefore equaled $10,159.68. According to the income percentages of the combined gross income, appellee was responsible for $9,194.51 of that figure and appellant was responsible for the remaining $965.17 per year. This would have provided appellant with approximately $766.20 per month in child support from appellee. Instead, the magistrate's final order only provided for $125.00 per month child support — a figure far below the true child support obligation.
 {¶ 69} The trial court initially reduced the original $9,194.51 per year child support figure to $4,111.67 per year. The support worksheet provides for a deviation from appellee's child support obligation in the form of a reduction of $5,079.84. The final support obligation for appellee, following this deviation, is $349.75 per month, less than one-half the original child support obligation. However, the magistrate again applied a *Page 17 
deviation to the already-reduced child support obligation of $349.75 per month to arrive at a figure of $125.00 per month.
 {¶ 70} The magistrate found as follows:
 {¶ 71} "Pursuant to the shared parenting plan, Mr. Gembus shall take the tax exemption and pay child support in the amount of one hundred and twenty-five dollars ($125.00) per month * * *. While the child support guidelines reflect an annual child support obligation of $4,114.67 and a monthly obligation of $349.75 * * * a deviation is warranted as the guideline amounts would be unjust or inappropriate and would not be in the best interests of the child. Plaintiff benefits from sharing living expenses by living in her grandmother's home; the evidence demonstrated that Ms. Kost saved over $500 in rent alone. Moreover, Plaintiff is voluntarily unemployed. She is clearly capable of working full time and earning more than sub-minimum wage."
 {¶ 72} We find this to be an abuse of discretion and contrary to law. The original deviation reduced appellee's obligation to $349.75 per month without explanation. The magistrate then reduced that obligation yet again for the expressed reasons of appellant's shared living expenses and voluntary underemployment.
 {¶ 73} R.C. 3119.24(A) provides that "[a] court that issues a shared parenting order * * * shall order an amount of child support to be paid * * * that is calculated in accordance with the schedule and with the worksheet set forth in section 3119.022 of the Revised Code * * *, except that, if that amount would be unjust or inappropriate to the children or either parent and would not be in the best interest of the child because of the extraordinary circumstances of the parents or because of any other factors or criteria set forth in section 3119.23 of the Revised Code, the court may deviate from that amount." *Page 18 
 {¶ 74} If the court deviates from the worksheet amount, it must "enter both the worksheet-calculated payment amount and its reasons for deviation from that payment amount into the record." Copas v.Copas, 4th Dist. No. 02CA754, 2003-Ohio-3473, at ¶ 8, citing DePalmo v.DePalmo (1997), 78 Ohio St.3d 535, 538. There is no provision for a double deviation. If the trial court intended to deviate from the child support order for parenting time, monthly expenses or other circumstances as allowed by statute, the obligation should have been reduced from the original child support figure; not an already reduced amount. Essentially, this dual deviation faulted appellant twice for sharing living expenses with her grandmother (a non-permanent solution in any event).
 {¶ 75} The deviation should be applied from the original child support amount as calculated by the child support worksheet prior to any reduction. If appellee is entitled to any reduction, the deviation should be applied from the original figure — not an already reduced amount.
 {¶ 76} We would also note that the deviation is intended to be for extraordinary circumstances — not a means for punishment or as a means to financially reward an obligor. This drastic reduction from the original support order appears to allow the exceptions to swallow the rule. Furthermore, the heart of every child support order is to protect the best interest of the child. We cannot see how the best interest of Isabella is best served by faulting appellant for residing with her grandmother and treating such as a permanent situation and by fostering such financial disparity between appellant and appellee.
 {¶ 77} Appellant also disputes the assignment of additional income to her by the trial court. The trial court assigned extra income in the amount of $4,545.00 to the appellant. *Page 19 
 {¶ 78} Appellant essentially argues that she should not be penalized because she has taken a lower paying job to have the opportunity to further her education and provide a better future for her children. Appellant testified that she is currently employed at Panini's Bar and Grille in Willoughby, Ohio where she earns $4 per hour, plus tips, and works approximately three days a week. She has a high school education, but has attended college at Lakeland on and off for the last 10 years, sometimes on a full-time basis, where she has taken general courses in the hopes of obtaining a nursing degree.
 {¶ 79} At the time of trial, appellant was attending school three days a week. She has prior experience working in the restaurant business, but also testified that, prior to and shortly after Isabella's birth, she worked at Employon, where she earned $35,000 per year and voluntarily reduced her hours, before quitting that job to stay at home with Isabella and so she could continue to attend school. Appellant further testified that the reason she went back to work part time was not primarily to provide for the children, but rather so appellee would not be responsible for the payment of her outstanding student loans.
 {¶ 80} We note that the $4,545.00 in income imputed was hardly arbitrary or unreasonable, based upon appellant's own testimony which revealed that her work schedule was between 20-25 hours per week. Based upon this testimony alone, the magistrate could reasonably infer that appellant could, at a minimum, earn this amount of income merely by taking a comparable position with a full time schedule. Thus, we cannot conclude that the magistrate abused his discretion in finding that appellant was voluntarily underemployed based upon these circumstances.
 {¶ 81} For the reasons stated in the Opinion of this court, it is the judgment and order of this court that the judgment of the Lake County Court of Common Pleas is *Page 20 
affirmed in part; reversed in part, and the matter is remanded to the trial court for further proceedings consistent with this opinion.
WILLIAM M. O'NEILL, J., concurs,
DIANE V. GRENDELL, J., concurs in judgment only with a Concurring Opinion.
[1] The original proposed shared parenting plan submitted by defendant called for a monthly support amount of $125.00 with appellee to maintain Isabella on his insurance plan and for him to take the tax exemption on Isabella. The latter two provisions remained intact in the trial court's temporary order. In appellant's proposed child support calculations, she agreed with regard to the tax exemption that "the exemption, presently, would be wasted since her income is low because of her attendance in school, and conceded this issue until "further order of the court."